# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| American Farm Bureau Federation, 600 Maryland Avenue SW, Suite 1000, Washington, DC 20024; | Civil Case No. _____ |
| American Petroleum Institute, 200 Massachusetts Avenue NW, Suite 1100, Washington, DC 20001; | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| National Association of Home Builders of the United States, 1201 15th St NW, Suite 400 Washington, DC 20005; | |
| National Cattlemen's Beef Association, 9110 East Nichols Avenue, Suite 300, Centennial, CO 80112; | |
| National Mining Association, 101 Constitution Ave. NW, Suite 500 East, Washington, D.C. 20001; | |
| Public Lands Council,  1275 Pennsylvania Avenue NW, Suite 801, Washington, DC 20004; | |
| and Western Energy Alliance,  1660 Lincoln Street, Suite 2175, Denver, CO 80264 | |
| Plaintiffs, | |
| v. | |
| United States Fish and Wildlife Service,1849 C Street NW, Washington, DC 20240; | |
| Doug Burgum, *in his official capacity as U.S. Secretary of the Interior*, 1849 C Street NW, Washington, D.C. 20240; | |
| National Marine Fisheries Service, 1315 East-West Highway, Silver Spring, MD 20910; | |

1

and Howard Lutnick, *in his official capacity as*
*U.S. Secretary of Commerce*, 1401 Constitution
Ave, NW, Washington, DC 20230.

Defendants.

## INTRODUCTION

1.     When the U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (collectively, the "Services") promulgated new rules under the Endangered Species Act ("ESA" or the "Act") in 2024, they ignored the language and limits of that statute in favor of overreaching and onerous regulations. This case challenges those unlawful regulatory changes under the Administrative Procedure Act ("APA").

2.     Under the first Trump Administration, the Services made much-needed reforms to the ESA's implementing regulations that aligned them with the Act's text and judicial precedent. *See* Final Rule, Endangered and Threatened Wildlife and Plants; Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45,020 (Aug. 27, 2019); Final Rule, Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976 (Aug. 27, 2019); Final Rule, Endangered and Threatened Wildlife and Plants; Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753 (Aug. 27, 2019) (collectively, the "2019 Regulations").

3.     After President Biden took office, his administration rescinded and revised the 2019 Regulations through a series of three rulemakings that were finalized in 2024. *See* Final Rule, Endangered and Threatened Wildlife and Plants; Listing Endangered and Threatened Species and Designating Critical Habitat, 89 Fed. Reg. 24,300 (Apr. 5, 2024); Final Rule, Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 89 Fed. Reg. 24,268 (Apr. 5, 2024); Final Rule, Endangered and Threatened Wildlife and Plants; Regulations Pertaining to Endangered and Threatened Wildlife and Plants, 89 Fed. Reg. 23,919 (Apr. 5, 2024) (collectively, the "2024 Regulations").

4.     The 2024 Regulations not only reverted to some of the unlawful provisions that

the 2019 Regulations had fixed, but also pushed even further beyond the ESA's intended reach than did the pre-2019 regulations. The result is a series of regulations that far exceed what the ESA authorizes and that will devastate businesses and livelihoods without meaningfully advancing the ESA's species recovery goals.

5. Plaintiffs are a collection of groups that represent the people and industries who are harmed by the 2024 Regulations. They bring this suit to enforce the limits of the ESA and the requirements of the APA that the Services ignored in promulgating the 2024 Regulations.

6. To remedy these statutory violations, Plaintiffs seek an order (1) declaring the 2024 Regulations unlawful and invalid, (2) vacating and remanding the 2024 Regulations, (3) enjoining reliance on the 2024 Regulations, and (4) reinstating the 2019 Regulations that are consistent with the ESA.

## PARTIES

7. Plaintiffs are a broad coalition of membership organizations representing the myriad interests of their members and members' clients who are harmed by the 2024 Regulations.

8. **Plaintiff American Farm Bureau Federation** ("AFBF") is a voluntary general farm organization formed in 1919 to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. It is headquartered in the District of Columbia. Through its state and county Farm Bureau organizations, AFBF represents nearly six million member families in all 50 states and Puerto Rico.

    a. Many farmers, ranchers, and foresters who belong to AFBF conduct activities affected by species listings. Beyond that, AFBF members typically live on the land they farm and ranch, working with a strong focus on both economic and

4

environmental stewardship. For most of these agricultural producers, farm and forest land is the principal asset used in their business. As a result, ESA restrictions are especially harsh for farmers and ranchers because those restrictions can prevent members from making productive use of their primary business asset.

9.    **Plaintiff American Petroleum Institute** ("API") is the primary national trade association that represents all facets of the oil and natural gas industry, which supports nearly 11 million U.S. jobs and 8 percent of the U.S. economy. API's approximately 600 members include large integrated companies; refining, marketing, pipeline, and marine business; and service and supply firms. API's members provide most of the nation's energy and are backed by a growing grassroots movement of millions of Americans. API represents the oil and natural gas industry by advocating for legislation at the federal, state, and local level; educating members of the general public about the benefits that oil and natural gas provide for human health, safety, convenience, and prosperity; engaging with federal and state administrative agencies to promote policies on behalf of the oil and natural gas industry; and engaging in litigation that impacts the oil and natural gas industry.

    a.    Since its formation in 1919 as a standards-setting organization, API has developed more than 700 standards to enhance operational and environmental safety, efficiency, and sustainability. Further, API and its members are responsible for developing essential energy resources and safely transporting them to consumers, which requires the construction and operation of pipelines, utility lines, offshore platforms, and other infrastructure. These and other actions often occur in or near habitat for threatened or endangered species, including

designated critical habitat, and many of these actions require federal authorizations that trigger consultation obligations under ESA Section 7. API's members' ability to responsibly explore for, develop, and transport natural gas and oil resources is therefore directly impacted by the listing of species and designation of critical habitat under the ESA, as well as the interagency consultation procedures required under ESA Section 7.

10.    **Plaintiff National Association of Home Builders of the United States** ("NAHB") is a Washington, D.C.-based trade association representing over 140,000 builder and associate member firms organized in approximately 750 affiliated state and local associations in all 50 states, the District of Columbia, and Puerto Rico. NAHB members include those who design, construct, and supply single-family homes; build and manage multi-family, light commercial, and industrial structures; develop land; and remodel existing homes. Due to the nature of the residential land development and home building processes, NAHB members and members of the public who seek to purchase a new home or obtain rental housing are directly impacted by the 2024 Regulations.

a.    When NAHB member projects trigger Section 7 consultation, members can face significant project delays, additional requirements or conditions imposed under federal authorizations, and costly project modifications (i.e., forfeiture of buildable lots). NAHB members are also subject to potential civil and criminal enforcement actions in the event that their construction activities incidentally "take" ESA-listed species—including both endangered or threatened species—without authorization by the Services. By increasing Section 7 consultation requirements, demands to mitigate impacts on species, and the scope of liability

under Section 9, the 2024 Regulations harm NAHB members by increasing costs and, in some cases, effectively stopping projects. By increasing costs and reducing housing projects, the 2024 Regulations also result in increased costs for prospective home buyers and renters, further decreasing housing affordability.

11. **Plaintiff National Mining Association** ("NMA") is a national trade association that serves as the voice of the mining industry. NMA's members produce most of America's metals, coal, and industrial and agricultural minerals and the hundreds of thousands of workers it employs. NMA's members are involved in every aspect of mining, from producers and equipment manufacturers to service providers. NMA works to ensure America has secure and reliable supply chains, abundant and affordable energy, and the American-sourced materials necessary for U.S. manufacturing, national security, and economic security—all delivered under world-leading environmental, safety, and labor standards. NMA represents the mining industry's interests before Congress, the administration, federal agencies, the courts, and the media.

    a. NMA has more than 250 members, including companies and organizations involved in every aspect of mining in the United States, that often conduct mining activities in or near habitat for listed species, including designated critical habitat. NMA members' coal and mineral operations routinely require federal authorizations that trigger section 7 consultation under the ESA and are subject to delays, burdensome and costly mitigation measures, and enforcement threats.

12. **Plaintiff Western Energy Alliance** (the "Alliance") is the leader and champion

for independent oil and natural gas companies in the West.  Working with a vibrant membership base for over 50 years, the Alliance stands as a credible leader, advocate, and champion of industry. Its expert staff, active committees, and committed board members form a collaborative and welcoming community of professionals dedicated to abundant, affordable energy and a high quality of life for all. Alliance members are independent oil and natural gas producers, the majority of which are small businesses with an average of fourteen employees.

    a.   The Alliance advocates for access to federal lands for exploration and production of oil and natural gas, and rational, efficient, and effective permitting and leasing processes. It promotes the beneficial use and development of oil and natural gas and represents its membership in federal rulemakings that may affect members' operations on federal, state, and private lands.

    b.   The 2024 Regulations' expansive requirements related to listing species and designating critical habitat result in reduced access, increased costs, unwarranted or unjustified permit requirements, delays, and a multitude of operational constraints that harm the ability of the Alliance's members to responsibly explore for, develop, and transport oil and natural gas resources.

13.    **Plaintiff National Cattlemen's Beef Association** ("NCBA") is a trade association that represents U.S. cattle producers, with more than 30,000 individual members and several industry organization members. In total, NCBA represents more than 175,000 of America's farmers, ranchers, and cattlemen who provide a significant portion of the nation's supply of food. NCBA works to advance the economic, political, and social interests of the U.S. cattle business and to be an advocate for the cattle industry's policy positions and economic interests. To that end, NCBA is committed to assisting its members by disseminating

information, meeting with legislators and agencies, drafting and commenting on legislation and agency rules, and, when necessary, participating in litigation in both state and federal courts.

14.    **Plaintiff Public Lands Council** ("PLC") represents ranchers who use public lands and preserve the natural resources and unique heritage of the West. PLC is a Colorado nonprofit corporation headquartered in Washington, D.C. PLC's membership consists of state and national cattle, sheep, and grasslands associations. PLC works to maintain a stable business environment for public land ranchers in the West where roughly half the land is federally owned and many operations have, for generations, depended on public lands for forage. PLC's members are directly and adversely impacted by the 2024 Regulations.

15.    The challenged 2024 Regulations and the legal violations alleged in this Complaint have injured and continue to injure Plaintiffs' interests, and granting the relief requested in this lawsuit would redress these injuries. The 2024 Regulations have caused and will continue to cause construction, development, agricultural, and industrial activities of Plaintiffs' members to be subjected to additional, costly, and burdensome ESA regulatory and permitting requirements. By increasing Section 7 consultation requirements, demands to mitigate impacts on species, and the potential for liability (or need to undertake burdensome measures to avoid liability) under Section 9, the 2024 Regulations harm Plaintiffs' members by increasing costs and, in some cases, effectively stopping projects.

16.    For example, as further explained below, the 2024 Regulations harm Plaintiffs by expanding the scope of reasonable and prudent measures that must be included in an Incidental Take Statement to include "offsets" and actions taken outside the action area. This increases burdens on Plaintiffs to implement costly compensatory mitigation and other

measures, even outside the action areas of their proposed projects. The Section 4 revisions harm Plaintiffs by expanding the protections of endangered species to threatened species across the board, and by obstructing the delisting of species that no longer require the ESA's protections. By extending the ESA's reach in these ways, the 2024 Regulations harm Plaintiffs by requiring more projects to trigger Section 7 consultation and subjecting more activities to Section 9's take prohibition.  As a result, Plaintiffs' members face increased project delays, additional conditions on federal authorizations, and costly mitigation measures and project modifications. They are also subject to increased risk of civil and criminal enforcement actions if their activities incidentally "take" ESA-listed threatened or endangered species without authorization by the Services. Moreover, the 2024 Regulations' unlawfully expansive definition of the scope of effects that agencies must consider during Section 7 consultations harms Plaintiffs by leading to more time-consuming formal consultations that delay Plaintiffs' projects and result in burdensome mitigation measures that would not otherwise be required.

17.     **Defendant FWS** is a federal agency within the Department of the Interior. FWS, through a delegation from the Secretary of the Interior, is responsible for creating regulations to implement the ESA, as well as enforcing the ESA.

18.     **Defendant NMFS** is part of the National Oceanic and Atmospheric Administration, a federal agency within the Department of Commerce. NMFS, through a delegation from the Secretary of Commerce, is responsible for creating regulations to carry out the ESA, as well as enforcing the ESA.

19.     **Defendant Doug Burgum**, U.S. Secretary of the Interior, is the highest-ranking official within the Department of the Interior and, in that capacity, has responsibility for the administration and implementation of the ESA with regard to endangered and threatened

terrestrial and freshwater plant and animal species, and for compliance with all other federal laws applicable to the Department of the Interior. Secretary Burgum is being sued in his official capacity.

20.    **Defendant Howard Lutnick**, U.S. Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has responsibility for the administration and implementation of the ESA with regard to endangered and threatened marine and anadromous species, and for compliance with all other federal laws applicable to the Department of Commerce. Secretary Lutnick is being sued in his official capacity.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the case involves questions of federal law.

22.    An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 5 U.S.C. §§ 705-06, 28 U.S.C. §§ 2201-02, and the Court's inherent equitable powers.

23.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (e) because at least one plaintiff resides in this District.

## LEGAL BACKGROUND

### A.    Administrative Procedure Act

24.    The APA governs the processes by which agencies formulate administrative rules and make decisions that implement Congress's statutory commands. At the same time, the APA emphasizes that the "reviewing court" retains authority to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706; *see Loper Bright Enters. v.*

11

*Raimondo*, 603 U.S. 369 (2024).

25.    Under the APA, a reviewing court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "without observance of procedure required by law." *Id.* § 706(2)(D).

**B.    The Endangered Species Act**

26.    Enacted in 1973, the ESA seeks to conserve species that are at risk of extinction. *See* 16 U.S.C. §§ 1531 *et seq*. To accomplish that end, the Act contains detailed instructions about designating species as "threatened" or "endangered," as well as detailed instructions on how to protect such species.

27.    To start, the Act authorizes the Secretary of the Interior to list terrestrial and freshwater species and the Secretary of Commerce to list marine and anadromous species that are endangered or threatened. *See id.* § 1533. The Secretaries' ESA duties have been delegated to FWS and NMFS. *See* 50 C.F.R. § 402.01(b).

28.    The ESA defines a threatened species as a species "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The Act defines an endangered species as a species "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).

29.    The Act tells the Services to "determine whether any species is an endangered species or a threatened species" based on the following factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued ex-
istence.

*Id.* § 1533(a)(1).

30.    Section 9 of the Act protects endangered species by prohibiting, among other

things, unauthorized "take." *Id.* § 1538(a)(1). The Act also requires the Services to issue "such

regulations as [they] deem[] necessary and advisable to provide for the conservation of"

threatened species, which may (but does not automatically) include extending Section 9's en-

dangered species protections to threatened species. *Id.* § 1533(d).

31.    When FWS or NMFS lists a species as endangered or threatened, it must also

"designate any habitat" of the species as "critical habitat," unless doing so would not be "pru-

dent." *Id.* § 1533(a)(3)(A)(i); 50 C.F.R. § 424.12(a). The Act defines "critical habitat" to in-

clude the "specific areas within the geographical area occupied by the species, at the time it is

listed . . . on which are found those physical or biological features (I) essential to the conser-

vation of the species and (II) which may require special management considerations or pro-

tection," or the "specific areas outside the geographical area occupied by the species at the

time it is listed" if such areas are determined to be "essential for the conservation of the spe-

cies." 16 U.S.C. § 1532(5)(A)(i)–(ii).

32.    Under Section 4 of the Act, critical habitat designations may only be made "af-

ter taking into consideration the economic impact, the impact on national security, and any

other relevant impact, of specifying any particular area as critical habitat." *Id.* § 1533(b)(2).

The Services may exclude an area from critical habitat if they determine that the benefits of

exclusion outweigh the benefits of designating the area, unless the Services determine based

on the best scientific data available that failure to designate the area will result in the extinc-

tion of the species. *Id.*

33.    In *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 586 U.S. 9 (2018), the U.S. Supreme Court held that "Section 4(a)(3)(A)(i) does not authorize the Secretary [of the Interior] to designate [an] area as *critical* habitat unless it is also *habitat* for the species." *Id.* at 368 (emphasis in original) (citing 16 U.S.C. § 1533(a)(3)(A)(i)). In other words, the Court ruled that "[o]nly the 'habitat' of [an] endangered species is eligible for designation as critical habitat," not areas that might develop into habitat in the future, even if the Service believes designation of such areas to be "essential for the conservation of the species." *Id.*

34.    The Supreme Court also held that ESA Section 4 "imposes a categorical requirement that the Secretary tak[e] into consideration economic and other impacts before" designating critical habitat. *Id.* at 371 (quotation marks omitted).

35.    Federal agency actions that may affect threatened or endangered species and/or critical habitat must meet the consultation requirements under Section 7 of the ESA. Section 7 requires federal agencies, in consultation with the Services, to "insure that any action authorized, funded, or carried out" by them "is not likely to jeopardize the continued existence of" any threatened or endangered species or "result in the destruction or adverse modification of" critical habitat. 15 U.S.C. § 1536(a)(2). At the end of formal consultation under Section 7, the Services issue a written statement (known as a Biological Opinion) "setting forth [the Services'] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." *Id.* § 1536(b)(3)(A). If the Services conclude that an agency action will jeopardize a listed species' continued existence or destroy or adversely modify critical habitat, the Services must include in the Biological Opinion suggested "reasonable and prudent alternatives" to the agency action or indicate that there are none. *See id.* If the Services conclude that the action, as proposed

or as modified by a reasonable and prudent alternative, will result in the "incidental take" of a listed species, the Services issue an "Incidental Take Statement" describing the impacts of the incidental take and setting forth "reasonable and prudent measures that the [Services] consider[] necessary or appropriate to minimize" the impact of such incidental take, along with enforceable terms and conditions to implement those reasonable and prudent measures. *Id.* § 1536(b)(4).

## FACTUAL BACKGROUND

### A.    The 2019 Regulations

36.    The Services promulgated the 2019 Regulations to update and streamline the agencies' longstanding regulations implementing Sections 4 and 7.

37.    The 2019 Regulations introduced much-needed clarity to the Services' ESA rules and ensured that the regulations were consistent with judicial interpretation of the ESA and the statute's plain language and intent. Among other changes, the 2019 Regulations:

a.    rescinded the "Section 4(d) blanket rule" that allowed FWS to automatically extend Section 9 take protections to threatened species;

b.    established a two-step process for designating unoccupied critical habitat consistent with the ESA's heightened standard for designating unoccupied areas and with the U.S. Supreme Court's holding in *Weyerhaeuser* that critical habitat can include only habitat at the time of designation;

c.    removed recovery as a factor for downlisting and delisting species; and

d.    limited Section 7 consultation to evaluating the proximate effects of an agency action.

15

**B.    The 2024 Regulations**

38.    On June 22, 2023, the Services proposed new regulatory packages to revise or rescind certain provisions of the 2019 Regulations. 88 Fed. Reg. 40,764 (proposed revisions to ESA Section 4 implementing regulations); 88 Fed. Reg. 40,753 (same for ESA Section 7); 88 Fed. Reg. 40,742 (proposed reinstatement of Section 4(d) blanket rule). Prior to proposing these changes to the 2019 Regulations, the Services had also rescinded other ESA regulatory changes by the Trump Administration. *See* 87 Fed. Reg. 43,433 (July 21, 2022) (rescinding Trump Administration procedures for excluding land from critical habitat); 87 Fed. Reg. 37,757 (June 24, 2022) (rescinding Trump Administration definition of "habitat" for purposes of designating critical habitat).

39.    The Services accepted comments on these proposed revisions through August 21, 2023. Because they dramatically increased regulatory burdens and went beyond what the ESA required, the proposed revisions elicited widespread criticism. The Services received more than 150,000 comments.

40.    Plaintiffs here—including AFBF, the Alliance, API, NMA, and NAHB—submitted comments on behalf of their affected members expressing concern that the proposed revisions were not reasonably explained and would cause confusion and compliance issues.[1]

41.    AFBF, for example, opposed "the reinstatement of the blanket 4(d) rule," "the Services' changes to delisting criteria, as they will create more confusion about a critically important part of the ESA," "[t]he Services' propose[d] [] change [to] how they view 'foreseeable future' when determining whether to list a species as threatened" and "the Services'

_____

[1] *See* https://www.regulations.gov/docket/FWS-HQ-ES-2021-0107; https://www.regulations.gov/docket/FWS-HQ-ES-2021-0104; https://www.regulations.gov/docket/FWS-HQ-ES-2023-0018.

arbitrary proposal to require offsets as part of Reasonable and Prudent Measures (RPMs) that can be included in an incidental take statement (ITS)." *See* https://www.regulations.gov/comment/FWS-HQ-ES-2023-0018-106301.

42.    The Alliance's comment letters similarly asked FWS to return the 2019 Regulations. In its letter commenting on the adoption of the Section 4(d) blanket rule, the Alliance called for FWS to "maintain 50 C.F.R. §§ 17.31(a) and 17.71(a) in their current form because they encourage tailored, species-specific protections that promote both the statutory objectives of the ESA and conservation and reduce burdens on land users." *See* https://www.regulations.gov/comment/FWS-HQ-ES-2023-0018-106068.

43.    NMA's comment letters likewise opposed the proposed changes to the critical habitat designation regulations, stating that the "plain language" of the ESA "evidences the Congressional objective to limit, not expand, critical habitat designation, particularly for unoccupied habitat." *See* https://www.regulations.gov/comment/FWS-HQ-ES-2021-0107-95245.

44.    Over the objections of Plaintiffs and other commenters, the Services issued the final 2024 Regulations on April 5, 2024.

**C.    Summary of the 2024 Regulations' changes**

*"Effects of the Action"*

45.    The 2024 Regulations define the scope of effects that agencies must consider during Section 7 consultation in a way that goes beyond what the Endangered Species Act itself allows.

46.    In the 2019 Regulations, the Services had included clear standards for determining whether an effect was both caused by the agency action and "reasonably certain to

17

occur." *See* 50 C.F.R. § 402.17 (2019). The Services did this to ensure that only the proximate effects of an action would be evaluated in Biological Assessments prepared by action agencies and Biological Opinions prepared by the Services. *See* 84 Fed. Reg. at 44,990-91 (describing changes to effects analysis). This "proximate effects" limitation is consistent with longstanding legal principles. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) ("For centuries, it has been 'a well established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause.'" (citation omitted) (alteration in original)).

47.    The 2024 Regulations eliminated the 2019 Regulations' limits on the effects analysis by removing 50 C.F.R. § 402.17 entirely. In this and other ways, the 2024 Regulations try to expand the effects analysis far beyond the bounds of what is "proximate" under the ESA itself. The 2024 Regulations cannot define "effects of the action" as, in relevant part, "all consequences to listed species or critical habitat that are caused by the proposed action, *including the consequences of other activities that are caused by the proposed action but that are not part of the action*" unless they also limit the term "effects" to those effects proximately caused by the agency's action, as required by the ESA. 50 C.F.R. § 402.02 (2024) (emphasis added).

*Factors for de-listing and down-listing species*

48.    The 2024 Regulations also revised the procedures the Services use for completely removing species from the threatened and endangered lists ("delisting") and reclassifying endangered species as threatened species ("downlisting"). In so doing, the 2024 Regulations purported to clarify that the Services may consider whether a species has "recovered to the point at which it no longer meets the definition of an endangered species or a threatened species." *Id.* § 424.11(e)(2)(2024). But "recovery" is not one of the statutorily enumerated

18

factors that the Services may consider when making listing decisions. 16 U.S.C. § 1533(a). Thus, far from providing clarity, this change introduced an entirely new factor to the listing decision process that the ESA does not authorize.

*Removal of the two-step critical habitat designation process*

49.      Section 4 of the ESA authorizes the Services to designate as critical habitat for a species (1) areas occupied by the species at the time of listing that contain physical or biological features that are essential to the conservation of the species and that may require special management considerations or protection and (2) areas unoccupied by the species at the time of listing that are essential for the species' conservation. *Id.* § 1532(5)(A)(i)-(ii). In *Weyerhaeuser*, 139 S. Ct. 361, the U.S. Supreme Court made clear that the Services could only designate as critical habitat areas that are *actually habitat* for a listed species.

50.      The 2019 Regulations recognized that the standard for designating areas that were not occupied by the species at the time of listing is higher than the standard for designating occupied areas as critical habitat. To implement this heightened standard, the 2019 Regulations introduced a two-step critical habitat designation process. The Services were first required to evaluate occupied areas. Once occupied areas were identified and designated, the Services could designate unoccupied areas only if they determined that such areas were essential for the species' conservation. The 2019 Regulations explained that unoccupied areas were essential only if (a) a designation limited to occupied habitat would be inadequate to ensure the species' conservation, (b) there was reasonable certainty that the unoccupied area would contribute to the species' conservation, and (c) the unoccupied areas contained one or more physical or biological features essential to the species' conservation. 50 C.F.R. § 424.12(b)(2) (2019).

19

51.     The 2024 Regulations eliminated this two-step process. The regulations now say: "After identifying areas occupied by the species at the time of listing, the [Services] will identify, at a scale determined by the [Services] to be appropriate, specific areas outside the geographical area occupied by the species at the time of listing that the [Services] determines are essential for the conservation of the species." *Id.* (2024). This new language ignores the heightened standard for designating unoccupied areas; removes clear factors for evaluating whether unoccupied areas are essential to the species' conservation that the 2019 Regulations introduced; and removes the requirement that the Services ensure that all areas designated are actually "habitat" as required by *Weyerhaeuser*.

*Reinstatement of the Section 4(d) "blanket rule"*

52.     The 2019 Regulations rescinded FWS's long-standing-but-unlawful Section 4(d) blanket rule, by which FWS had automatically extended Section 9 take protections to threatened species.

53.     The 2024 Regulations reinstated the FWS's Section 4(d) blanket rule, ignoring the statutory (and common sense) distinctions between threatened and endangered species, and the separate protections that the ESA affords based on those distinctions.

*Scope of reasonable and prudent measures*

54.     The 2024 Regulations also expanded the scope of reasonable and prudent measures that must be included in an Incidental Take Statement to include "offsets" and actions taken outside the action area. 50 C.F.R. § 402.14(*i*)(2)–(3) (2024).

55.     The ESA makes clear that reasonable and prudent measures must be "necessary and appropriate to *minimize*" the effects of incidental take. 16 U.S.C. § 1536(b)(4) (emphasis added). The statutory requirement to "minimize" and the 2024 Regulations'

20

requirement to "offset" are completely different concepts. To minimize means to "to reduce to the smallest possible amount, extent, size, or degree." *Minimize*, Am. Heritage Dictionary of the English Language 1121 (5th ed. 2018). To offset, by contrast, means to "counterbalance, counteract, or compensate for." *Id.*, *Offset* at 1224. The ESA's use of the term "minimize" thus does not authorize "offset."

56.    Including offsets within the scope of reasonable and prudent measures also renders other sections of the ESA superfluous in violation of well-established statutory interpretation principles. A separate provision of the ESA—Section 10—requires applicants for Incidental Take Permits to "minimize and mitigate" the impacts of such take. 16 U.S.C. § 1539(a). The Service's own guidance document makes clear that "minimization and mitigation" under Section 10 includes "supplying some benefit to the species such as land acquisition or habitat restoration or enhancement to offset unavoidable effects of the action." FWS & NMFS, Endangered Species Consultation Handbook 2-4 to 2-5 (Mar. 1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf. "Minimization" under Section 7, by contrast, includes actions like education, predation reduction, species removal or avoidance, and monitoring, not mitigation. *Id.* at 4-53 ("It is not appropriate to require mitigation for the impacts of incidental take."). The Service's inclusion of offsets within the scope of Section 10 but not Section 7 shows that the Service views offsets as mitigation, not minimization. By allowing offsets to be required as reasonable and prudent measures to minimize effects under Section 7, the 2024 Regulations thus effectively read the Section 10 "mitigation" requirement out of the statute and unreasonably ignore the Service's longstanding interpretation of Sections 7 and 10.

57.    The inclusion of off-site actions as reasonable and prudent measures also far

exceeds what is necessary or appropriate to minimize effects and, further, contradicts another section of the same regulation that prohibits reasonable and prudent measures from "alter[ing] the basic design, location, scope, duration, or timing of the action." 50 C.F.R. § 402.14(*i*)(2). Requiring offsite measures, by definition, alters the "location" and "scope" of an action by requiring federal permit applicants to take action outside the locations where their activities would occur.

**FIRST CLAIM FOR RELIEF**
*Violation of the APA (5 U.S.C. § 706)*

58.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

59.    The ESA requires agencies, in consultation with the Service, to evaluate the effects of agency action to ensure that such action will not jeopardize the continued existence of listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). Under well-established legal principles, the scope of the ESA's effects analysis is limited just to the agency action's proximate effects. *See Lexmark Int'l, Inc.*, 572 U.S. at 132.

60.    The 2024 Regulations far exceed the proximate effects limitation in the ESA, including by requiring agencies to evaluate "*consequences of other activities that are caused by the proposed action but that are not part of the action.*" 50 C.F.R. § 402.02 (2024) (emphasis added).

61.    Because the 2024 Regulations contradict the plain language of the ESA and well-established principles of statutory interpretation, they are arbitrary, capricious, and not in accordance with law in violation of the APA.

**SECOND CLAIM FOR RELIEF**
*Violation of the APA (5 U.S.C. § 706)*

62.    Plaintiffs reallege, as if fully set forth herein, each and every allegation

22

contained in the preceding paragraphs.

63.    The ESA includes an exclusive list of factors that the Service may consider when making species listing decisions. 16 U.S.C. § 1533(a)(1).

64.    The 2024 Regulations revise the Service's implementing regulations for making listing decisions to include as a factor whether "[t]he species has recovered to the point at which it no longer meets the definition of an endangered species or a threatened species." 50 C.F.R. § 424.11(e)(2) (2024).

65.    Recovery is not a factor listed in the statute for making listing decisions. By including this factor, the 2024 Regulations are arbitrary, capricious, and not in accordance with law in violation of the APA.

## THIRD CLAIM FOR RELIEF
### *Violation of the APA (5 U.S.C. § 706)*

66.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

67.    Section 4 of the ESA provides that the Service may designate as critical habitat for a species, areas that are (1) occupied by the species at the time of listing that contain physical or biological features that essential to the conservation of the species and that may require special management considerations or protection and (2) unoccupied by the species at the time of listing that are essential for the species' conservation. 16 U.S.C. § 1532(5)(A)(i)-(ii). Critical habitat must also be "habitat" for the species at the time of designation, as required by the U.S. Supreme Court's decision in *Weyerhaeuser*.

68.    The 2024 Regulations ignore the heightened standard for designating unoccupied habitat (*i.e.*, essential to the conservation of the species) by removing the 2019 Regulations' two-step designation process. Instead, the 2024 Regulations merely say: "After

identifying areas occupied by the species at the time of listing, the Secretary will identify, at a scale determined by the Secretary to be appropriate, specific areas outside the geographical area occupied by the species at the time of listing that the Secretary determines are essential for the conservation of the species." *Id.* (2024).

69.    Unoccupied habitat cannot logically be essential to a species' conservation if occupied habitat alone would ensure conservation. Further, unoccupied habitat must be habitat. By no longer requiring the Services to confirm whether occupied areas would ensure conservation before designating unoccupied areas, the 2024 Regulations ignore the ESA's plain language defining critical habitat to include only those unoccupied areas "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). And by no longer requiring the Services to ensure that such areas designated habitat are actually habitat (*i.e.*, contain one or more physical or biological features essential to the species' conservation), the 2024 Regulations ignore *Weyerhaeuser*'s clear holding that critical habitat can only include habitat for a species at the time of designation.

70.    Accordingly, the changes to the Services' critical habitat designation regulations are arbitrary, capricious, and not in accordance with law in violation of the APA.

## FOURTH CLAIM FOR RELIEF
### *Violation of the APA (5 U.S.C. § 706)*

71.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

72.    The ESA protects two types of species—"threatened" and "endangered"—and extends distinct protections to each. Specifically, "endangered" species are automatically protected from unauthorized take under ESA Section 9. 16 U.S.C. § 1538(a)(1). Threatened species are not automatically protected, though the Services may extend take prohibitions to

24

threatened species on a case-by-case basis when they promulgate a regulation to protect a specific threatened species. *See id.* § 1533(d).

73.    The 2024 Regulations' reinstatement of FWS's "blanket 4(d) rule," which afforded the same protections to threatened and endangered species regardless of their differences, ignores the ESA's clear distinction between threatened and endangered species. *See* 50 C.F.R. Pt. 17. The 2024 Regulations also ignore the plain scope of Section 9, which applies automatically only to endangered species. This regulation is therefore arbitrary, capricious, and not in accordance with law in violation of the APA.

**FIFTH CLAIM FOR RELIEF**
*Violation of the APA (5 U.S.C. § 706)*

74.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

75.    Section 7 of the ESA allows the Services to take "reasonable and prudent measures" that are "necessary and appropriate to minimize" the impacts of incidental take. 16 U.S.C. § 1536(d).

76.    The 2024 Regulations far exceed the "necessary and appropriate to minimize" standard that the ESA imposes. Specifically, the 2024 Regulations say that reasonable and prudent measures can include "measures implemented . . . outside of the action area that avoid, reduce, or offset the impact of incidental take." 50 C.F.R. § 402.14(*i*)(2). By allowing such measures to include "offsets," which are distinct from "minimization," the regulations exceed the scope of what the ESA says reasonable and prudent measures can include. And by allowing such measures to occur outside the action area, the regulation not only far exceeds what is "necessary or appropriate to minimize" effects but also contradicts another provision in the same section that prohibits reasonable and prudent measures from altering a project's

location and scope. *Id.*

77.    By imposing standards for reasonable and prudent measures not found in—and beyond the scope of—the statute, and by creating regulations that are internally inconsistent, the changes to the reasonable and prudent measure regulations are arbitrary, capricious, and not in accordance with law in violation of the APA.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court grant the following relief:

1. Declare that the Services' 2024 Regulations are not in accordance with the ESA and exceed the Services' statutory authority;

2. Declare that the Services acted arbitrarily, capriciously, and contrary to the ESA, in violation of the APA, 5 U.S.C. § 706(2)(A), in promulgating the 2024 Regulations;

3. Enjoin the Services from applying or otherwise relying on the 2024 Regulations;

4. Vacate and remand the 2024 Regulations;

5. Reinstate the 2019 Regulations that are consistent with the ESA;

6. Award Plaintiffs their attorney's fees and costs; and

7. Grant such additional relief as the Court may deem just and proper.

Dated: March 31, 2025

Respectfully submitted,

By: _/s/ Tyler Welti_
Tyler Welti (D.C. Bar No. 1015691)
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
415.653.3714
415.653.3755 (fax)
tgwelti@venable.com

Jay C. Johnson (D.C. Bar No. 487768)
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
202.344.4698
jcjohnson@venable.com

Counsel for Plaintiffs