UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FARM BUREAU FEDERATION, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, et al.,<br><br>*Defendants*,<br><br>and<br><br>CENTER FOR BIOLOGICAL DIVERSIY, WILDEARTH GUARDIANS, SIERRA CLUB, and DEFENDERS OF WILDLIFE,<br><br>*Defendant-Intervenor-Applicants.* | Case No. 1:25-CV-00947-SLS |

## DECLARATION OF MICHAEL SENATORE

I, Michael Senatore, declare as follows:

1. My name is Michael Senatore. I am over the age of 18 and competent to testify. The information in this declaration is based on my personal experience and my review of publicly available information.

2. I am Senior Vice President of Conservation Programs at Defenders of Wildlife ("Defenders") in Washington, DC. I have worked at Defenders for more than 25 years. I am familiar with the organization's operations and goals. I previously held roles as Attorney and Litigation Director for Defenders. From 2010 to 2023, I served as the Vice President for Conservation Law. In my current position, I oversee the organization's work related to the

conservation of imperiled species and their habitats, including species protected under the Endangered Species Act ("ESA").

3. My academic training includes a Bachelor of Science degree in biology from the University of Maine in Orono, Maine, and a Juris Doctor degree from Suffolk University Law School in Boston, Massachusetts.

4. Defenders is a 501(c)(3) nonprofit organization founded in 1947 with approximately 2.1 million members and supporters nationwide. Headquartered in Washington, DC, Defenders' programmatic work in the field occurs in Alaska, California, the Pacific Northwest, the Rocky Mountains and Great Plains, the Southwest, and the Southeast.

5. Defenders' primary mission is to further the protection of native wildlife and plants in their natural communities. We focus our programs on the accelerating rate of species extinction and associated loss of biological diversity. We work to protect and strengthen the environmental laws and regulations that provide a basis for wildlife conservation in the United States, such as the ESA. We also encourage conservation of threatened and endangered species by advocating to the federal agencies that jointly administer the ESA—the U.S. Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS") (collectively, the "Services")—to protect imperiled species and habitats.

6. Defenders accomplishes its goals with partners at local, state, regional, and national levels through demonstrated on-the-ground conservation, research, policy development, advocacy, and litigation. Defenders advocates for sound, scientifically-based approaches to wildlife conservation geared to restoring imperiled species and preventing others from becoming imperiled in the first instance. In furtherance of our work to protect imperiled wildlife, we routinely participate in legislative and administrative proceedings that involve the ESA. We do

this work to ensure that the ESA, the world's foremost and most successful wildlife law, remains effective in safeguarding wildlife and habitat for present and future generations.

7. Defenders represents the interests of our members and supporters who care deeply about the conservation of endangered and threatened species. Our members include scientists who have dedicated their professional careers to species conservation; recreationists who travel across the country to view and photograph wildlife; animal-lovers who hope to save these species from extinction; and practitioners of a variety of faiths who find spiritual significance in wilderness and wildlife. Our membership also includes staff that have dedicated years, sometimes decades, of their professional careers to protection of imperiled wildlife. These members' interests rely on effective ESA regulations that advance the statute's goal of preventing threatened and endangered species' slide into extinction and instead conserving and recovering them.

8. Much of Defenders' work involves the ESA. We petition for imperiled species to be listed as threatened or endangered and for the designation of their critical habitat. For example, we advocate that, if the Service determines to list a species as threatened rather than endangered, that it apply the full range of statutory protections through the blanket 4(d) rule or through a legally adequate species-specific 4(d) rule.

9. We also work to ensure that federal agencies comply with their mandatory statutory obligations to consult with the Services about the impacts of federal actions on listed species and critical habitat to ensure against likely jeopardy, and advocate for the full range of impacts to be considered. We also routinely comment on critical habitat proposals, and our position is that, where appropriate, unoccupied critical habitat areas be included in designations

when the best available science shows that these areas are essential for the conservation of the species.

## Defenders' Work on ESA Regulations

10. Defenders has expended significant effort advocating for effective ESA regulations that implement the law appropriately and protect imperiled wildlife and their habitats. Defenders engaged heavily in the successive rulemakings resulting in changes to the regulations over the previous two administrations. In 2018, during the first Trump administration, the Services issued proposed rules revising the ESA regulations, including by rescinding the blanket 4(d) rule and revising the regulations under section 4 and 7 of the ESA. Defenders invested significant staff time into drafting comment letters opposing these proposals. As Vice President of Conservation Law, I signed those comment letters on behalf of Defenders.

11. Defenders also worked as part of a coalition that submitted to the Services more than 800,000 comments opposing the proposal to rescind the Service's blanket 4(d) rule as well as the proposed amendments to the Services' joint regulations implementing sections 4 and 7 of the ESA. When FWS finalized the rescission of the blanket 4(d) rule in 2019, and the Services finalized their amendments to the joint regulations implementing sections 4 and 7, Defenders and other groups challenged the lawfulness of those actions in federal district court in the Northern District of California, Civ. No. 3:19-cv-05206.

12. When FWS, under the Biden administration, proposed to reinstate the blanket 4(d) rule in 2023, and to make further changes to the section 4 and section 7 regulations highlighted in Plaintiffs' complaint, Defenders again invested significant staff time to develop three lengthy comment letters supporting the revisions—including all of the revisions highlighted in Plaintiffs' complaint—and proposing additional changes to further strengthen the

regulations. As Senior Vice President, I reviewed those comments before they went to Defenders' then-CEO for signature. The regulations amending the section 4 regulations, amending the section 7 regulations, and reinstating the blanket 4(d) rule were finalized on April 5, 2024. 89 Fed. Reg. 24300 (section 4); 89 Fed. Reg. 23,919 (4(d)); 89 Fed. Reg. 24268 (section 7).

13. On January 20, 2025, President Trump issued Executive Order 14154, titled "Unleashing American Energy." 90 Fed. Reg. 8353 (Jan. 29, 2025).

14. On February 3, 2025, Interior Secretary Burgum issued Secretarial Order No. 3418, also titled "Unleashing American Energy."[1] Section 4(b), under the title "Directive," directs all Assistant Secretaries to develop and submit action plans that, inter alia, include "steps that, as appropriate, will be taken to suspend, revise, or rescind documents, including but not limited to" a list of regulations and other agency documents.

15. The enumerated list of regulations to be suspended, revised, or rescinded includes all of the regulations at issue in Plaintiffs' complaint: the reinstated blanket 4(d) rule, 89 Fed. Reg. 23,919 (Apr. 5, 2024), the section 4 rule, 89 Fed. Reg. 24,300 (Apr. 5, 2024), and the section 7 rule, 89 Fed. Reg. 24268 (Apr. 5, 2024).

16. Plaintiffs' attempt, in this case, to have the 2024 regulations remanded may result in yet another rulemaking regarding the ESA regulations, necessitating another expenditure of significant staff time and resources for Defenders to review and comment on a new regulatory proposal so that it may oppose reinstatement of the 2019 ESA regulations in the manner Plaintiffs request.

---

[1] *Available at* https://www.doi.gov/sites/default/files/document_secretarys_orders/so-3418-signed.pdf. (last visited April 15, 2025).

**Defenders' Work on the Blanket 4(d) Rule**

17. Under the ESA, species can be listed as either endangered or threatened. The ESA's express purpose is to conserve listed species and their habitats—that is, affirmatively to take all necessary actions to recover these species to the point where the statute's protections are no longer necessary.

18. Endangered species automatically receive all the protections against unauthorized "take" prescribed by section 9 of the statute. Threatened species do not receive section 9 protections unless covered by a regulation promulgated pursuant to ESA section 4(d), 16 U.S.C. § 1533(d). FWS promulgated a "blanket 4(d) rule" in 1975 for wildlife and one in 1977 for plants. Under the blanket 4(d) rule, all threatened species received all section 9 protections by default upon listing unless FWS promulgated a species-specific 4(d) rule for that species.

19. Defenders has relied on the blanket 4(d) rule to help conserve those species that FWS listed as threatened. A sample of threatened species that have benefited from the blanket 4(d) rule and for which Defenders has advocated includes the piping plover, marbled murrelet, northern spotted owl, red knot *rufa*, Florida manatee and southern sea otter, to name a few.

20. Defenders also has advocated against inadequate species-specific 4(d) regulations that are insufficient to the conservation needs of affected threatened species. Examples of species-specific 4(d) rules containing significant exemptions for activities known to harm the affected species include the polar bear, lesser prairie-chicken, northern long-eared bat, and Georgetown salamander.

21. In the case of the polar bear, FWS explicitly found that greenhouse gas emissions are the leading threat to the polar bear's Arctic sea ice habitat, but then issued a 4(d) rule that exempted all greenhouse gas emissions and other activities outside the current range of the polar

6

bear from take prohibitions. In the case of the northern long-eared bat, the Service exempted many industries and activities from take regulation even though white-nose syndrome has spread rapidly throughout most of the species' range, decimating its population; the rule even exempted remaining bats not yet affected by white-nose syndrome from any take protections at all. Defenders went to court to litigate both rules.

22.     Unlike FWS, NMFS has never had a blanket 4(d) rule. Instead, threatened species under its jurisdiction receive take protections only if it issues a species-specific 4(d) rule. For many species under its jurisdiction, it has never issued a species-specific 4(d) rule, leaving those species without legal protections against unauthorized take.

23.     NMFS' approach has acted to threatened species' detriment, allowing them to decline further towards endangered status following listing, contrary to Congress' express directive to recover species. For example, in 2018, following listing petitions from Defenders, NMFS listed the oceanic whitetip shark and the giant manta ray as threatened species in two separate rules. In both instances, Defenders' rulemaking comments had urged NMFS to promulgate species-specific 4(d) rules if it determined to list the species as threatened rather than endangered. In both instances, the agency explicitly determined at the time of listing that issuing 4(d) rules was not necessary and advisable for conservation.

24.     Yet in the face of both species' continued decline, including ongoing losses caused by incidental bycatch in U.S. fisheries, NMFS published in the Federal Register a proposed 4(d) rule for the oceanic whitetip shark in 2024 and identified a proposed 4(d) rule for the giant manta ray for submission to the Office of Information and Regulatory Affairs in the Fall 2024. The agency has not taken final action on the proposed 4(d) rule for the oceanic whitetip shark and has not yet published a proposed 4(d) rule for the giant manta ray for notice

7

and comment. Both species continue to be taken in U.S. fisheries without protective regulations. These additional declines resulting from NMFS' failure to promulgate timely species-specific 4(d) regulations and its lack of a blanket 4(d) rule have impaired Defenders' members' protectable interests in the conservation and recovery of the oceanic whitetip shark and giant manta ray.

25. Defenders has also undertaken policy research on 4(d) rules. In 2017, Defenders published a white paper titled "Section 4(d) Rules: The Peril and the Promise" as part of a series on Defenders' vision of the ESA's future. The white paper encompassed a comprehensive review of every 4(d) rule issued through May 2016. Based on its review, Defenders concluded that species-specific 4(d) rules—developed in lieu of applying blanket 4(d) protections—require improvements to ensure the effective conservation of threatened species.

26. Defenders and its members' interests in protecting threatened species will be negatively affected if the blanket 4(d) rule is invalidated in this lawsuit. The blanket 4(d) rule is a necessary tool in FWS's regulatory toolbox to protect and conserve threatened species. The blanket 4(d) rule does not impair FWS's discretion to promulgate a species-specific 4(d) rule where appropriate. Without adequate take protections, threatened species are at risk of declining further towards endangered status, to the detriment of this nation's biodiversity and Congress' express goal of fully recovering these species.

27. One concrete example of a threatened species that is likely to suffer harm—and, concomitantly, harm Defenders' longstanding organizational and members' interests—if Plaintiffs succeed in this lawsuit is the Florida manatee. For more than fifty years, Defenders has invested substantial resources into advocating for manatee conservation. Defenders has worked on the ground to protect manatees and manatee warm-water and feeding habitats in Florida;

petitioned FWS to expand designated critical habitat; brought multiple lawsuits to ensure FWS and other federal agencies comply with their ESA obligations to protect the species; and submitted detailed comments on proposed rules affecting the manatee. Defenders' members and supporters have longstanding aesthetic, recreational, spiritual, scientific, and professional interests in viewing, enjoying, studying, and protecting Florida manatees in the wild.

28. Manatees face threats from boat collisions and boat propellers, which can injure manatees, causing take under ESA section 9. Defenders has advocated for years to reduce these threats, including through litigation.

29. In 2017, over Defenders' and many other conservation organizations' opposition, FWS changed the status of the West Indian manatee from endangered to threatened. In doing so, it applied the blanket 4(d) rule to maintain all section 9 take protections for the species.

30. On January 14, 2025, FWS proposed to list the Antillean manatee and the Florida manatee as two separate subspecies, proposing the Antillean manatee for endangered status and the Florida manatee for threatened status. FWS proposes to continue to have the blanket 4(d) rule cover the Florida manatee, maintaining all section 9 protections. It has not proposed a species-specific 4(d) rule, although it has asked for public comment on this issue. Under the ESA's mandatory statutory deadlines, FWS must take final action on the proposed rule within 12 months of its publication (or 18 months if FWS determines a one-time extension is appropriate).

31. If Plaintiffs are successful in this lawsuit, FWS will likely be unable to finalize its rule listing the Florida manatee as a threatened species covered by the blanket 4(d) rule without undertaking a separate rulemaking subject to notice-and-comment procedures for a species-specific 4(d) rule. If this occurs, the Florida manatee will be deprived of section 9 take protections until and unless FWS initiates and completes that rulemaking process. The resulting

harm to the Florida manatee in the absence of robust protections against unauthorized take will significantly impair Defenders' and its members' interests in manatee conservation. Among other things, manatees face ongoing threats from boat collisions—which clearly constitute section 9 take—and would be deprived of protections from these harms in the absence of the blanket 4(d) rule.

### Defenders' Work on the Section 7 Consultation Process

32. Defenders also has worked extensively to advocate for full and effective consultations under section 7 of the ESA. Defenders is a champion of the consultation process; for example, regularly offering testimony on Capitol Hill about its importance.[2] Defenders has advocated for full section 7 protections in the context of numerous species, including the Canada lynx, North Atlantic right whale, desert tortoise, pygmy owl, and more. Defenders depends on strong section 7 protections for its advocacy work, and its interest in conserving these imperiled species would be injured if the harmful changes to the section 7 regulations imposed in 2019 were to be restored.

33. Section 7 provides: "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined … to be critical." 16 U.S.C. § 1536(a)(2). During these consultations, the Services are required to "evaluate the effects of the action" and add these effects, plus cumulative effects, to the

---

[2] *E.g.*, https://defenders.org/newsroom/round-two-defenders-testifies-endangered-species-act-section-7-consultations.

environmental baseline to make a determination regarding jeopardy to the species or adverse modification of critical habitat. *See, e.g.*, 50 C.F.R. § 402.14(g).

34. In 2019, the Services adopted an overly restrictive definition of "effects of the action," including the adoption of 50 C.F.R. § 402.17, which unduly limited the effects analysis. 84 Fed. Reg. at 45,018. Among other things, that section required "clear and substantial information" to determine whether activities are "reasonably certain to occur" such that they are included in the "effects" that are considered during consultation. The novel "clear and substantial information" standard introduced significant confusion by introducing conflict with the longstanding statutory requirement that consultations be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

35. When the subsequent administration proposed in 2023 to remove section 402.17, Defenders strongly supported the proposal that this confusing and ineffective language be removed. Defenders' and its members' interests will be harmed if the removal of section 402.17, which Defenders supported, is reversed.

36. Defenders advocates for the inclusion of all effects of proposed agency actions as part of consultation, and will continue this advocacy in the future. For example, in 2021 Defenders filed a lawsuit in federal district court in Colorado challenging the biological opinion for the forest plan for the Rio Grande National Forest. That lawsuit pointed out various deficiencies in the effects analysis for the underlying biological opinion. *Defs. of Wildlife v. United States Forest Serv.*, 94 F.4th 1210 (10th Cir. 2024). Confusion in the scope of consultation will make such advocacy more difficult and less effective.

### **Defenders' Work on Section 4 Listing and Critical Habitat**

37. Defenders also regularly advocates for timely and effective listing and critical habitat designations under ESA section 4 and the associated regulations. For example, within just the past six months Defenders has devoted substantial resources to commenting on critical habitat proposals for the Florida manatee and Canada lynx. Defenders also is engaged in ongoing litigation to secure the listing of the pinyon jay. *Defenders of Wildlife v. Haaland*, No. 1:24-cv-03433 (D. Colo.)

38. With respect to critical habitat in particular, Defenders has long opposed undue and unlawful restrictions on designation of unoccupied critical habitat. Defenders' comments on the 2018 proposal to erect barriers to such designation expressed strong opposition to the proposal. When the Services proposed to remove these barriers in 2023, Defenders' comments expressed strong support.

39. Defenders supports the removal of barriers to designating unoccupied critical habitat because unoccupied critical habitat may be important to species recovery. An imperiled species may only occupy a portion of its historic range, and will need to expand beyond currently occupied areas to fully recover. To provide a related example, in its January 27, 2025 comments on the proposed critical habitat designation for Canada lynx in the lower 48, Defenders advocated for the addition of connective habitat, so that lynx can move between core areas as the population recovers and expands. A regulation that erects hurdles to the designation of unoccupied critical habitat, such as the 2019 regulation that Plaintiffs seek to impose in this lawsuit, will make such advocacy more difficult and less successful in the future.

40. These and all of the harms outlined in this declaration would be redressed by a ruling against Plaintiffs' attempts to vacate the 2024 ESA regulations and reinstate the 2019 ESA regulations.

I hereby declare under penalty of perjury that the foregoing declaration is true and correct.

Dated this 11th day of April, 2025.

Michael Senatore
Senior Vice President of Conservation Programs
Defenders of Wildlife