**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FARM BUREAU FEDERATION, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, et al.,<br><br>*Defendants*,<br><br>and<br><br>CENTER FOR BIOLOGICAL DIVERSITY, WILDEARTH GUARDIANS, SIERRA CLUB, and DEFENDERS OF WILDLIFE,<br><br>*Defendant-Intervenor-Applicants.* | Case No. 1:25-CV-00947-SLS |

**DECLARATION OF DAVID NOAH GREENWALD**

I, Noah Greenwald, declare as follows:

1. My name is Noah Greenwald. I am over the age of 18 and competent to testify. The information in this declaration is based on my personal experience and my review of publicly available information.

2. I am a member of the Center for Biological Diversity ("Center") and have been for nearly 28 years. I am also the endangered species program director for the Center for Biological Diversity, where I have worked since 1997.

3. The Center is a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout

the United States and Mexico, including in Washington, D.C. The Center has more than 93,000 members. The Center and its members are concerned with the conservation of imperiled species, including ones that will be affected by the regulations at issue in this suit, and with the effective implementation of the Endangered Species Act ("ESA").

4. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through creative media, science, policy, and the law. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future.

5. The Center's activities include public education, advocacy, and litigation to enforce environmental laws. As part of its mission the Center works to enact, strengthen, and enforce the ESA, its regulations, its guidelines, and the species-specific decisions that protect endangered and threatened species and the ecosystems on which they depend. The Center also routinely prepares reports, email newsletters, printed newsletters, and other forms of media regarding the National Marine Fisheries Service's ("NMFS") and the U.S. Fish and Wildlife Service's ("FWS") (collectively "Services") implementation of the ESA for distribution to its members, the news media, and the public.

6. The Center's members rely on the Center to defend the ESA and its implementing regulations to ensure that they continue to effectively protect imperiled species and to keep them informed of species-specific decisions that the Services take pursuant to the ESA.

7. The Trump administration's 2019 ESA regulations ("2019 Regulations")—84 Fed. Reg. 44,753 (Aug. 27, 2019) (ESA Section 4(d) regulation); 84 Fed. Reg. 44,976 (Aug. 27,

2019) (ESA Section 7 regulations); 84 Fed. Reg. 45,020 (Aug. 27, 2019) (ESA Section 4 regulations)—which Plaintiffs seek to reinstate, fundamentally undermine the purpose of the ESA. Far from helping to conserve imperiled species, these regulations weaken protections for listed species and worsen an already massive backlog of over 400 species awaiting protection under the ESA by injecting politics and economics into what should be purely scientific decisions.

8. In my capacity as the Endangered Species Program Director for the Center, I have been responsible for petitioning for ESA protections for species. I am also responsible for reviewing the status of species and ecosystems, and for overseeing the work of staff, who also routinely petition for ESA protections for species and review the status of species and ecosystems.

9. The Center and its staff routinely submit petitions to the Services to list species as endangered or threatened under the ESA and to designate both occupied and unoccupied critical habitat for species, and advocate for strong, science-based protections for species listed as "threatened." As a result of the Center's work, over 700 species and nearly half a billion acres of critical habitat have been protected under the ESA.

10. I authored and the Center submitted a petition to list the Cascade red fox on October 21, 2024. The petition included a request to designate critical habitat, including unoccupied critical habitat, in the North Cascades, as well as travel corridors between the south and North Cascades in Washington. I looked for the Cascade red fox last year during a backcountry ski trip to Muir Camp on Mt. Rainier. I plan to look for them this spring or early summer while backcountry skiing on Mt. Adams.

11. I also drafted a petition to list the Cascades population of the Sierra Nevada Red

Fox, which could be listed as threatened by FWS. I regularly visit the Sierra Nevada red fox's habitat on Mt. Hood and in central Oregon, and have had the pleasure of seeing one of the fox's twice in the past. I plan to look for them on multiple occasions this spring during backcountry skiing excursions in the Oregon Cascades and in coming years during further backcountry ski trips on Mt. Hood or elsewhere.

12. Likewise, I visit the habitat of the northwestern pond turtle at the Rogue River and in the Columbia River Gorge. I floated the Rogue River in October 2024 and looked for the turtle although I was not successful in finding one. I plan to visit the Columbia River Gorge this summer to look for the turtle. I hope to hike the trail paralleling the Rogue River in the next five years and will again look for the turtle. The turtle was proposed for listing as a threatened species by the Biden administration and waits final protection under the Trump administration.

13. I deeply value my ability to see and appreciate the Cascade red fox, Sierra Nevada red fox and Northwestern pond turtle and their habitat. I regularly visit the mountains and rivers where these species live and would be saddened if the species are allowed to disappear and I no longer would have the opportunity to look for them.

14. Listing of the Cascades red fox, Sierra Nevada red fox and the northwestern pond turtle would be less likely, and the protections they would receive less robust, if the 2019 Regulations are reinstated. As a result, the relief Plaintiffs seek to reinstate the 2019 Regulations harms both my own personal interests as well as the interests of the Center.

15. For instance, in 1975, FWS promulgated the so-called "Blanket 4(d) Rule." This rule has provided invaluable protection to threatened species by providing them with full protection from "take" under the ESA unless FWS promulgated a species-specific rule pursuant to section 4(d) of the ESA. Nearly a quarter of species currently listed as threatened have a

species-specific 4(d) rule and thus rely on the blanket 4(d) rule for protection.

16. However, on August 12, 2019, under the first Trump administration, FWS eliminated the Blanket 4(d) Rule as part of the 2019 Regulations. Without the protection provided by the Blanket 4(d) Rule, threatened species will receive essential protections only if FWS issues a species-specific 4(d) rule. But the Trump administration's recission of the Blanket 4(d) Rule imposed no obligation or deadlines on FWS to adopt any such species-specific rules. The Center commented in opposition to the 2019 Regulations, including the Blanket 4(d) Rule rescission, and worked as part of a coalition that delivered over 800,000 public comments in opposition. The Biden administration's 2024 revisions to the 2019 Trump regulations reinstated the FWS's Blanket 4(d) Rule, which the Center supported in its comments on the 2024 Regulations. Regulations Pertaining to Endangered and Threatened Wildlife and Plants, 89 Fed. Reg. 23919 (Apr. 5, 2024). The Center is a co-plaintiff in a lawsuit pending in the Northern District of California challenging certain sections of the 2024 and 2019 ESA Regulations; it was a co-plaintiff in prior litigation challenging the 2019 ESA Regulations; and the Center has moved to intervene as a defendant in a lawsuit in the District of Montana that challenges the Blanket 4(d) Rule.

17. Plaintiffs now, however, seek to vacate the Blanket 4(d) Rule. If this were to happen, whenever the Center petitions FWS to list species, we will need to request that FWS issue a sufficiently protective species-specific 4(d) rule should the species be listed as threatened, and we will have to explain and support in detail why a particular species should receive protection from various forms of take—a cumbersome task we did not have to undertake when the Blanket 4(d) rule was in effect.

18. Recently, the Center has submitted numerous petitions that could result in

threatened listings such as petitions to list the Cascades red fox, Sierra Nevada red fox, diamondback terrapin, saltmarsh sparrow, American horseshoe crab, and others. FWS has also recently proposed several species to be listed as threatened that the Center petitioned for or otherwise advocated to be listed, including the alligator snapping turtle, Pecos pupfish, northwestern pond turtle, and others. These species are awaiting final rules granting protection. Finally, FWS is also likely planning, according to its own regulatory agenda, on "reclassifying" certain species from endangered to threatened, including the Gila topminnow, Topeka shiner, southern clubshell, and norther red-bellied cooter.

19. I am concerned that the Trump administration will not finalize species-specific 4(d) rules for these species, leaving them with little protection if the Blanket 4(d) Rule is rescinded as Plaintiffs seek, harming the Center's members' and my interest in them. With each of the species, if the Blanket 4(d) Rule were rescinded, Center staff will be forced to spend significant time addressing the need for 4(d) rules, time that otherwise could be spent seeking protections for other imperiled species were it not for the removal of the Blanket 4(d) rule. In the past, FWS would have provided many if not most of these species with protection under the Blanket 4(d) Rule, and the Center would not have had to expend the effort of compiling the best available science regarding sufficiently protective species-specific 4(d) rules. Also, if FWS lists these species as threatened without protections, the Center and its members' interests in these species will be harmed. Even if FWS does issue specific 4(d) rules, they are likely to be weaker than the protections afforded endangered species, again harming the Center's interests and my interests in threatened species such as the Cascades red fox, Sierra Nevada red fox, and northwestern pond turtle.

20. The Center will also have to spend additional time and resources advocating that

species, including the ones the Center is currently drafting petitions for, should be listed as endangered rather than threatened, because endangered species automatically receive protection from take under the ESA. This is all work the Center would not have to undertake if the Blanket 4(d) Rule remains in place because threatened species without species-specific 4(d) rules will automatically receive all of the protections provided to endangered species. This additional work has and will necessitate the commitment of substantial Center time and resources that would not otherwise have been necessary and will impair the Center's ability to carry out its core mission to protect and conserve all imperiled species that warrant listing under the Act.

21.     If FWS must issue species-specific 4(d) rules for every species listed as threatened, it will inevitably and necessarily impede the agency's ability to make timely listing decisions and will contribute to an ever-growing backlog of species awaiting protection. The agency currently has a backlog of over 400 species awaiting decisions about their protection. In 2016, it developed a workplan to address about half the backlogged species over seven years, but has failed to make many of the decisions specified in the workplan in every year since. Any further delay results in more imperiled species sitting in bureaucratic limbo while they desperately need protection. This delay will seriously frustrate the Center's efforts to achieve timely protections for these species, all of which the Center and its members have interests in protecting.

22.     As such, if Plaintiffs succeed and the Blanket 4(d) Rule is again rescinded, it will undermine and impede the Center's work to protect threatened species and harm my interests in these species, including the Cascade red fox population, Sierra Nevada red fox and northwestern pond turtle.

23.     Full reinstatement of the 2019 Regulations will also bring back into force

numerous other provisions harmful to the Center and its members' interests.

24.  For instance, the 2019 Regulations removed the phrase "without reference to possible economic or other impacts" from the regulation governing what factors the agencies will consider when listing a species. This unavoidably invites the intrusion of improper political and economic factors into the listing process. In removing the phrase, the 2019 Regulations made clear the Services' intention to compile economic information on the supposed costs of listing species in the future—indeed, there is no other plausible reason for the change in language. However, the ESA commands that listing decisions be based solely on the best available science. Economic impacts can legally play no part. At the very least, compiling economic information that should have no impact on the substance of listing decisions will further delay the listing of species, contributing to the already expansive backlog of species awaiting the protection of the ESA that the Center has spent enormous time and resources attempting to address. At worst, it will lead to arbitrary listing decisions based on factors Congress never intended the Services to consider.

25.  If the 2019 Regulations are reinstated, the Center, for its part, will be compelled to submit comments on proposed rules for listing species regarding why the Services should not compile or consider the economic information that the Service publishes along with its proposed listing rules. The Center will also have to refute the economic information outright, both to ensure that it does not influence the Service's deliberations and, just as important, to ensure that it does not influence political and public opinion on the propriety of listing—which is one of the patently obvious reasons why the Trump administration's 2019 Regulations opened the door to the publication of economic information that should play no role in listing decisions under the plain terms of the ESA. In turn, this puts the Center in the untenable position of either hiring

economic experts at significant cost or devoting significant staff time to responding to the economic assessments presented by the Services. This poses very real harm to the Center and its longstanding programmatic efforts to secure the listing of at-risk species as well as to maintain public and political support for the listing process generally.

26. Plaintiffs also seek to reinstate the 2019 Regulations' definition of "foreseeable future"—a definition that harms the Center's members and undermines the Center's work to conserve imperiled species, particularly in an era in which the threats posed by climate change have an enormous bearing on listing decisions. By injecting a two-step requirement—requiring both future threats and a species' response to those threats to be "likely"—the 2019 Regulations significantly raise the bar for species listings, especially for species impacted by climate change or other future events where the exact outcome and the species' exact response to that outcome cannot be known with certainty.

27. In response, the Center, which has expended enormous organizational resources to secure ESA protection for species imperiled by climate change (such as the polar bear and Pacific walrus), will have to spend even more organizational resources than would otherwise be the case to meet the FWS's stringent two-step test. The Center, for example, has worked for years to protect the Pacific walrus, which is imminently threatened by climate change and is awaiting a new decision of whether it will be listed as threatened or endangered.

28. Plaintiffs' relief seeking the reinstatement of the 2019 Regulations will also broaden the bases on which the Services can find that the designation of critical habitat is not prudent to include instances when " threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act" or "[t]he Secretary otherwise determines that designation of critical habitat

would not be prudent based on the best scientific data available." 50 C.F.R. § 424.14(a)(1)(ii), (v) (2019). This expansion of the circumstances in which the Services will determine that the designation of critical habitat is "not prudent" for listed species impedes the Center's work and its ability to effectively advocate for critical habitat protections for listed species.

29. For instance, FWS found designating critical habitat for the Mt. Rainier white-tailed ptarmigan, which was proposed for listing as a result of a petition from the Center and then a settlement agreement reached between the Center and FWS—"not prudent" under the 2019 Regulations. Under the 2019 Regulations, FWS found designation "not prudent" because the threats to the ptarmigan's habitat "stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act"—namely climate change. This conclusory assertion, in addition to being untrue as it adopts an overly narrow view of what management actions can be undertaken by an action agency, ignores the conservation benefits the ptarmigan would receive if critical habitat were designated.

30. This specific provision was eliminated with the Biden administration's 2024 regulatory amendments, resulting in FWS reversing course and stating that critical habitat would be considered for the ptarmigan. Critical habitat designation for the ptarmigan could help focus the efforts of conservation partners and federal agencies own conservation programs as well as provide early guidance to help protect essential habitat while FWS develops a recovery plan. Additionally, critical habitat provides significant regulatory protection, requiring federal agencies to consider the effects of their actions on critical habitat. Absent a critical habitat designation, federal agencies will only have to ensure that their actions do not jeopardize the ptarmigan's ongoing survival, rather than also ensuring that their actions do not destroy or adversely modify the stoneflies' essential habitat. But if plaintiffs are successful in reinstating the

2019 regulations, the ptarmigan will not receive these much needed protections, which would harm the Center's interests in a species it worked to protect as well as the concrete interests of the Center's members in those species.

31. I looked for the ptarmigan last year when I ascended Mt. Rainier to Muir Camp on my skis. I plan to look for the ptarmigan again this spring during a backcountry ski trip to Mt. Adams. I deeply value these quixotic, winter birds. If plaintiffs succeed, my interest in Mt. Rainier white-tailed ptarmigan and their habitat will be harmed.

32. Reinstatement of the 2019 regulations would also raise barriers to designating unoccupied critical habitat by requiring the Services to, amongst other things, only consider unoccupied areas to be essential where a critical habitat designation limited to geographical areas currently occupied by the species is inadequate to ensure the conservation of the species and where such areas contain one or more of those physical or biological features essential to the conservation of the species. However, designating unoccupied critical habitat for species such as the Cascades red fox is essential to putting them on the path to recovery because the Cascade red fox now only occurs within less than 50% of its historical range. For species such as this, whose remaining populations are isolated from one another, designating unoccupied critical habitat can put them on the path to recovery by ensuring that areas are protected for them to expand into as ongoing and past logging north of Mount Rainier has severely fragmented the landscape and is likely limiting their recolonization of habitat in the North Cascades. Designating unoccupied critical habitat can also help connect their currently existing, isolated populations.

33. If this Court were to reinstate the 2019 Regulations, then both Center and myself, as a member whose interests in imperiled species are represented by the Center, would be harmed, and a court order denying Plaintiffs such relief would redress these harms.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct, to the best of my knowledge, information, and belief.

Executed this 14th day of April, 2025, in Portland Oregon

_____
*Noah Greenwald*